IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KEVIN MCLAUGHLIN, REBECCA MCLAUGHLIN, PHILLIP DUTT, and MCLAUGHLIN DUTT, LLC, ) ) ) ) | |
| Plaintiffs ) ) | |
| vs. ) ) | CIVIL ACTION NO. 08-0611-CG-C |
| THE KRYSTAL COMPANY, ) ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on the motion of defendant, The Krystal Company, for summary judgment (Doc. 28), plaintiffs' response thereto (Doc. 32), and defendant's reply (Doc. 34). The court finds that there is no evidence that defendant breached the agreement entered into by the parties. Therefore, defendant's motion for summary judgment is due to be granted.

**FACTS**

This case arises from defendant's non-renewal of plaintiffs' license or franchise agreement for the operation of a Krystal restaurant in Saraland, Alabama. On or about May 27, 1997, plaintiffs and the defendant entered into a five-year "Non-Traditional Location License Agreement," wherein Krystal granted plaintiffs the right to use Krystal's name and business system to operate a non-traditional restaurant in a convenience store/gasoline station at 1121 Industrial Parkway, Saraland, Alabama. (Complaint, ¶ 6; Agreement - Doc. 28, Ex. A). The term "Non-Traditional" refers to the fact that plaintiffs' restaurant was not a free-standing restaurant, but was instead located inside a convenience store. Plaintiffs were granted the non-traditional

1

license even though the agreement expressly noted that Krystal "traditionally and as a matter of clear priority prefers to grant franchises to qualified persons to own and operate KRYSTAL or KRYSTAL KWIK restaurants as free-standing restaurant units." (Agreement ¶ C). The original term of the agreement was to run from January 13, 1998, to January 12, 2003. (Complaint, ¶ 6). The agreement stated that it "does not in any way grant or imply any exclusive or protected area, market, territorial or other protected rights proprietary to Licensee." (Agreement ¶ 1.1). It further stated that "Licensee recognizes that it is KRYSTAL's clear preference to develop or franchise traditional free-standing KRYSTAL restaurants and that KRYSTAL reserves the right to establish company-owned, franchised or licensed restaurants at any other location it chooses." (Agreement, ¶ 1.1). The agreement included the following provision with regard to renewal:

> Renewal. Licensee shall have the right to renew this license for successive terms of five (5) years each, providing that before the end of the initial or any renewal term all of the conditions hereinafter set forth have been fulfilled:
>
> 2.2.(A)  Licensee has during the entire term of this Agreement, complied with all its provisions;
>
> 2.2(B)  Licensee has given notice of renew to KRYSTAL which KRYSTAL request be given in writing at least six (6) months prior to the expiration of the then-current term;
>
> 2.2(C)  Licensee has executed upon renewal KRYSTAL's then-current form of Agreement (with appropriate modifications to reflect the fact that the Agreement relates to the grant of a renewal license), which Agreement shall supersede in all respect this Agreement, and the terms of which may differ from the terms of this Agreement, including, without limitations, a different percentage Royalty and Service Fee and advertising fee.
>
> 2.2(D)  Licensee pays KRYSTAL the then-current initial license fee; and
>
> 2.2(E)  Licensee has executed a general release, in a form prescribed by KRYSTAL, of any and all claims against KRYSTAL and its subsidiaries and affiliates, and their respective officers, directors, agents, shareholders and employees.

(Agreement, ¶ 2.2).

The agreement also includes the following under the general heading "Standards and Uniformity of Operation":

> Maintenance and Remodeling.   The Unit shall be, and shall remain, constructed and equipped in accordance with the manner authorized and approved by KRYSTAL for this System and as may be directed from time to time by KRYSTAL.  The building and premises shall be maintained in clean and good condition and Licensee shall undertake and complete such repairs, improvements and alterations as may be requested by KRYSTAL within a reasonable time specified by KRYSTAL.  Licensee agrees that in order to maintain an operational image of quality, KRYSTAL, may from time to time by revising the operations Manual, require the Licensee to remodel the Unit to incorporate a new general appearance, new services or new image, signs and decor.  Licensee shall make no material alterations to the improvements of the Unit nor shall Licensee make material replacements of or alterations to the equipment fixtures or signs of the Unit without the prior written approval of KRYSTAL.

(Agreement, ¶ 6.0).  The agreement stated that Krystal's food service format and system "is periodically updated and improved." (Agreement, ¶ A.).

Because the original five-year term of the license would expire in January 2003, plaintiffs timely requested renewal of their license in June 2002.  By letter dated November 20, 2002, Krystal approved plaintiffs' renewal request "contingent upon the following required building upgrades or improvements and/or operational or training requirements:"

> **Recommendation is to relocate to a new location with an SB-25. However renewal of the existing location is possible with only a 5-year agreement with the following requirements.**
>
> 1. Building must be fully re-imaged to new specifications.
> 2. Dining room area must be enclosed to represent a true restaurant environment.
> 3. Minimum seating of 24, with freestanding tables and chairs.
> 4. all exterior and interior signs must be re-imaged to new specifications.
> 5. Re-image Drive thru Menu board with Howard dress up kit.

**Renewal requirements regardless of location are:**

6. All managers must go through BMT/BMC training.
7. Must be current with all accounts to Krystal.
8. Must use the ACH program for all royalties and marketing payments.

(Doc. 28, Ex. C (emphasis in original)).  "As an accommodation to support and assist" plaintiffs in complying with the above described renewal requirements, Krystal granted plaintiffs an extension of their current Franchise agreement through June 12, 2003. (Id.).  The letter further stated that "it is expressly understood that Krystal shall terminate the current Franchise Agreement/License Agreement at the end of this agreement extension if the provisions have not been completed to Krystal's requirements." (Id.).  The "SB-25" mentioned in the letter refers to a freestanding restaurant. (Richards Depo. p. 49-50).

In February 2003 and again in March 2004, plaintiffs attempted to purchase land on which to build a new freestanding Krystal restaurant and submitted formal site-submission applications for both to Krystal. (McLauglin Depo. pp. 97-102, 107-113).  Each time Krystal approved the applications. (McLaughlin Depo. pp. 97-98, 107).  Unfortunately, the purchase of the properties on which plaintiffs proposed to build fell through. (McLaughlin Depo. pp. 102-104, 113).

In October 2003, Krystal sent an email and followed with an identical letter, dated October 17, 2003, indicating plaintiffs had been granted a final extension through the end of the year. (Doc. 33, Ex. F, letter dated Oct. 17, 2003).  The October letter also stated:

> In reviewing your current location, we find too many obstacles to over come in order to renew this location.  This area has proven its need for a full-service stand-alone Krystal restaurant.  We request that you use the attached extension to find a new location.  I have asked Gary Greve to assist in locating a new site.  Time is of the utmost importance; please locate a new site, which meets all Krystal's approval criteria within the extension allotment.  Then, follow all

>Krystal company real-estate approval guidelines with Gary Greve so we can start the process of building a new Krystal location.

(Doc. 33, Ex. F). A second document, also dated October 17, 2003, again stated that plaintiffs were granted an extension through the end of the year and that their renewal request was approved contingent upon plaintiffs relocating to a new location within the trade area to an approved Krystal site. (Doc. 28, Ex. D-2).

Plaintiffs wrote Krystal a letter, dated November 15, 2003, with several questions regarding negotiating out of their lease for the facility where their existing restaurant is located and their future plans with Krystal. In the letter, plaintiffs stated that they would continue to look for property because it is their "ultimate goal" "to build a new building" but expressed concern over the timing because plaintiffs still had significant debt relating to their existing restaurant and because plaintiffs had renewed their lease for the existing restaurant for another five years. (Doc. 28, Ex. D-4).

A letter dated, January 14, 2004, from Krystal to plaintiffs states that plaintiffs were granted a final extension of their current Non-Traditional Location License to December 31, 2004, with several contingencies. The first set of contingencies involved repairs, cleaning and maintenance of plaintiffs' existing restaurant - replacing non-compliant signs, cleaning interior of restaurant, power washing exterior areas and building, repairing and painting walls and ceiling of dining room and replacing light bulbs. The letter also stated that the extension had been granted with the provision that plaintiffs would purchase a new site to relocate the restaurant by September 30, 2004, and would construct and open a new Krystal restaurant by December 31, 2004. (Doc. 28, D-6).

On January 26, 2004, plaintiffs sent Krystal a letter stating that they had reviewed the

January 14, 2004, letter and greatly appreciate the extension, but have a concern that was not addressed by Krystal's letter.  Plaintiffs point to the fact that their existing lease contains provisions for renewal and the first renewal occurred after plaintiffs' first five year term.  Plaintiffs stated that they are currently in the second term of the lease, with monthly payments of $2,700 and a balance of $129,600 for the newest term.  In the letter, plaintiffs state that they would like Krystal to advise them as to how to vacate the lease without harm to either party.  (Doc. 28, D-8).

Krystal responded with a letter, dated February 3, 2004, stating that Krystal was not sure what more they could do for plaintiffs, since Krystal did not negotiate plaintiffs' lease and did not renew the lease.  Krystal further explained the history and status of the renewal of plaintiffs' franchise agreement as follows:

> We advised you in November 2002 of certain requirements necessary for you to meet in order for us to renew your original agreement.  We also recommended that you relocate to a different site and construct a new building.  Subsequent to that, you located new property, submitted a request to us and received approval to build on that site.  It is unfortunate that the transaction fell through.  Because we realize that it was not your fault, we granted you yet another extension to allow you sufficient time to find new property.  Somewhere in this process you apparently elected to renew your existing lease for a period of time that extends well past the extensions we had granted you.  To suggest now that we are somehow at fault for your situation is irresponsible and disappointing.
>
> Our correspondence with you in November of 2002 clearly states what must happen to receive a renewal of your existing agreement.  It is your decision whether you choose to comply with those requirements or relocate.  We have granted you a number of extensions on your agreement because you told us you wanted to relocate.  It is inconsistent that you would tell us you wanted to relocate, and at the same time elect to renew your lease for several years.
>
> We have been very accommodating in working with you well past the expiration of your franchise agreement while you searched for replacement property.  Our most recent extension is yet another example of our willingness to accommodate you.  Our accommodations were based on your search for a new location.  Had

> we known that you intended to stay in your current location, we would not have granted you additional extensions. It is important now Kevin, for you to be very clear with us about your intentions. If you wish to relocate, our last extension letter dated January 14, 2004, can remain in place. If you do not wish to relocate, then you must comply immediately with the requirements of our November 2002 letter. Please advise us immediately of your intentions.

(Doc. 28, Ex. D-9-10).  After receiving the Feb. 3, 2004, letter, plaintiff Kevin McLaughlin states that he "was surprised that he brought up the possibility of us merely receiving a renewal of our C store location, especially because we had already made all the modifications to the restaurant that had been asked of us except for building the enclosure." (Doc. 33-B, Kevin McLaughlin Affid. ¶ 4).  McLaughlin concedes that they had been given an option to renew the existing restaurant in the November 2002 letter and that the option was presented here again in the February 3 letter. (McLaughlin Depo. pp. 143, 145).  McLaughlin states that when he received the Feb. 3 letter, plaintiffs "already had so many communications with Krystal about building a freestanding restaurant, and spent money and so much time pursuing a new location, that my response ... was that we would continue forward in that process. (McLaughlin Affid. ¶ 5).  McLaughlin testified that plaintiffs were under the impression because of the unbelievable pressure Krystal was putting on them that plaintiffs had no option. (McLaughlin Depo. p. 145).  However, it was never Richard's intention to relinquish the C store if they were unable to find a suitable piece of property. (McLaughlin Affid. ¶ 6).

Plaintiffs wrote Krystal in response to the January 14 and February 3 letters confirming that plaintiffs' "plan to open a restaurant at a different site and in a new building has not changed."  The letter further stated:

> I will acquire a new site, construct a new building, and open a new restaurant by dates set in your January 14 letter. I restate my commitment with the understanding that upon meeting the terms of the extension in your January 14

>letter, The Krystal Company will renew the Agreement for a twenty-year term beginning January 1, 2005.
>
>I will need your assistance in obtaining a loan by signing a document that evidences the extension in your January 14 letter and renewal of the Agreement upon meeting the extension's terms. My bank prefers this document rather than our recent correspondence. My attorney, Eric Cromwell, will prepare the document and contact you soon.
>
>I believe that we can reasonably and quickly achieve our goals. I look forward to continuing my successful business relationship with The Krystal Company.

(Doc. 28, D-12).

Plaintiffs were unable to find a piece of real estate in the immediate area that was available at a price that made sense to plaintiffs. (McLaughlin Affid. ¶ 6).

Krystal's franchise area director for plaintiffs' location, Steve Smith, testified that he was not aware of any other C store type of restaurant that was required to enclose their dining area as a condition of renewal. (Doc. 32, Ex. N, Smith Depo. p. 43). According to Kevin McLaughlin, he had a contractor who was ready to bid on building the enclosure, but they never received guidance from Krystal on where it was supposed to be located and how it was to be constructed. (McLaughlin Affid. ¶ 4). Plaintiffs never pursued any actual work toward or spent any money on enclosing the restaurant because they planned to pursue relocation of the restaurant if they could make it work for them financially . (McLaughlin Depo. p. 150).

In January 2005, Krystal terminated plaintiffs' license and revoked their right to use the Krystal name and business system. (Complaint, ¶ 13).

## LEGAL ANALYSIS
### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted:

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil

Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Discussion**

Plaintiffs claim defendant breached their franchise agreement by attempting to place extra-contractual conditions on the plaintiffs' exercise of their renewal right and ultimately revoking the plaintiffs' license to use the Krystal name and business system. (Complaint, ¶ 19). The contract in this case specified that the contract shall be construed in accordance with and governed by the laws of the State of Tennessee, and the parties apparently agree that Tennessee law applies to this case. (See Agreement ¶ 18.0(A); defendant's brief p. 12; plaintiffs' brief pp. 12, 17).  Under Tennessee law,  the basic elements of a breach of contract claim are "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996).

Plaintiffs claim that defendant breached the contract by placing "extra-contractual

conditions" on their renewal right in that they required them to relocate and build a freestanding restaurant. (See Complaint, ¶ 10; plaintiffs' brief p. 12). "Defendant Krystal acknowledges that if it <u>had</u> imposed relocation as a requirement for renewal of the Agreement, ... that denial <u>on that basis alone</u> could constitute a breach of contract." (Defendant's brief p. 5, emphasis in original). However, defendant asserts that the undisputed evidence demonstrates that the construction of a free-standing restaurant was only an option, not a requirement. According to defendant, plaintiffs were given two options: 1) to relocate, and 2) to remodel the existing restaurant. The majority of evidence on this issue consists of a string of letters exchanged between the parties. It is undisputable that defendant sent plaintiffs a letter on November 20, 2002, indicating that plaintiffs had two options as defendant contends. Plaintiff, Kevin McLaughlin, conceded at his deposition that the November 2002 letter had given them an option to renew the existing non-traditional restaurant, and he further conceded that the option was again restated in a letter from Krystal dated February 3, 2004.

  Plaintiffs do not allege that Krystal did not have the right under the agreement to require the upgrades and/or improvements requested. Provision 6.0 of the contract authorized Krystal to require plaintiffs to remodel. The contract stated that plaintiffs agree that Krystal "may from time to time by revising the operations Manual, require the Licensee to remodel the Unit to incorporate a new general appearance, new services or new image, signs and decor." Plaintiffs' right to renewal was conditioned on complying with this provision as with all other provisions of the contract. (See Agreement, ¶ 2.2(A)). There is no evidence that the improvements requested were unreasonable. Plaintiffs did not voice any objection to the required improvements and in fact complied with most of them.

  Plaintiffs contend instead that defendant's true design was to pressure plaintiffs into relocating and building a free-standing restaurant. Plaintiffs argue that as Krystal in fact had plans to open up a free-standing restaurant shortly after plaintiffs' license was canceled. It was no secret that defendant preferred that plaintiffs relocate. However, plaintiffs' license agreement

expressly stated that it was not exclusive and did not grant plaintiffs a protected area, market, or territory. Thus, the agreement did not prohibit plaintiffs from opening up another restaurant in the area even while plaintiffs' restaurant was still operating under its Krystal license. Additionally, preferring and even pressuring plaintiffs to relocate does not violate the contract. The contract itself states that Krystal "traditionally and as a matter of clear priority prefers to grant franchises to qualified persons to own and operate KRYSTAL or KRYSTAL KWIK restaurants as free-standing restaurant units." (Agreement ¶ C). Even defendant's November 2002 letter to plaintiffs, which plaintiffs concede presented two options, indicated that relocating to a new location was defendant's recommended course of renewal. However, the November 2002 letter also stated that "renewal of the existing location is possible." (Doc. 28, Ex. C). Although plaintiffs have asserted that the defendant put pressure on them to relocate, they have not asserted that such pressure amounts to "undue pressure" or duress. Tennessee courts define undue pressure or duress as

> an unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination. The alleged coercive event must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a person of ordinary firmness.

McClellan v. McClellan, 873 S.W.2d 350, 351-52 (Tenn. Ct. App. 1993) (citations omitted). "Business compulsion is not established merely by proof that consent was secured by the pressure of financial circumstances, especially where the party claiming duress is experienced in business and not a novice." Whitmire v. Way-FM Group, Inc., 2008 WL 5158186, *2 (M.D. Tenn. Dec. 8, 2008)(citing Bridgeport Apartments Partnership v. Ellerbe, 2004 WL 221310 at * 2 (Tenn.Ct.App. Feb.2, 2004)). "Duress in the legal sense only exists when one by the unlawful act of another is induced to make a contract or perform some other act which deprives him of the exercise of free will. Id. at n. 2 (citing Holloway v. Evers, 2007 WL 4322128 at * 9 (Tenn.Ct.App. Dec.6, 2007) & Johnson v. Ford, 147 Tenn. 63, 245 S.W. 531 (1922)). Plaintiffs have not presented evidence that the pressure exerted by defendant was of such severity so as to

overcome plaintiffs' mind and will. Although plaintiffs state that they were confused by some of the correspondence, there is no evidence that defendant misrepresented anything to plaintiffs, that defendant acted unlawfully, or that defendant threatened plaintiffs in any way other than by requiring that plaintiffs comply with the agreement if they wanted to exercise their right to renewal.

      Plaintiffs point out that several of defendant's other letters imply that relocation was the only option. The first correspondence that indicates relocation was the only option is the October 17, 2003, letter which stated that Krystal found there were too many obstacles to over come in order to renew plaintiffs' existing location. Krystal then requested that plaintiffs use an additional extension through the end of 2003 to find a new location. Krystal clearly stated that the extension through the end of 2003 was contingent upon plaintiffs relocating to a new location. While this indicates that plaintiffs no longer had the option of renewing by bringing their existing restaurant into compliance, Krystal was not obligated by their contract to give plaintiffs any additional time. The original term of their license agreement expired in January 2003 and Krystal had informed them that they needed to comply with the stated requirements to renew the existing property. Krystal had already granted them additional time to comply, at least until June 12, 2003, and at the time of the October 17, 2003, letter, plaintiffs were nine months past the expiration of the original term set by their agreement. When plaintiffs then wrote Krystal questioning the propriety of relocating given their economic concerns, Krystal informed plaintiffs again that they had two options, renewal of the existing restaurant or relocating, but stated that Krystal had granted plaintiffs lengthy extensions with the expectation that plaintiffs would follow through with their apparent commitment to relocate. Plaintiffs had clearly shown through both their actions and words that they planned to relocate. Krystal ultimately allowed plaintiffs until December 31, 2004, two years after the term of the original agreement was to expire, to comply with the stated requirements for renewal. It is undisputed that plaintiffs never complied with all of the required contingencies for renewal of their existing location, because

13

they did not enclose the dining room area.

Plaintiffs argue that they were never given the specifications for building a wall to enclose the dining room.  However, plaintiffs admit that they put forth absolutely no effort towards enclosing the dining area.  Notably, none of plaintiffs' correspondence requests guidance on the enclosure.  Although constructing a wall to enclose the dining area was not expected to be a huge expense, plaintiffs did not want to spend any money towards enclosing the dining area because they intended to pursue the second option of relocating if they could make it work financially.  Plaintiffs were unable to find a suitable property to purchase for relocation and ultimately let their extended contract with Krystal expire without complying with the renewal requirements.  There is no evidence defendants breached any terms or requirements of the license agreement and thus, plaintiffs cannot maintain their breach of contract claim.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (Doc. 28) is **GRANTED**.

**DONE** and **ORDERED** this 14th day of August, 2009.

  /s/ Callie V. S. Granade  
CHIEF UNITED STATES DISTRICT JUDGE